# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Wilfredo Ayala, :
               Petitioner : No. 1037 C.D. 2022
                       : Submitted: April 28, 2023
             v. :
                       :
Fundamental Labor Strategies, Inc. :
(Workers' Compensation Appeal :
Board), :
               Respondent :

BEFORE:   HONORABLE ANNE E. COVEY, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE STACY WALLACE, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WALLACE                     FILED: January 2, 2024

Wilfredo Ayala (Claimant) petitions for review of the order of the Workers' Compensation Appeal Board (Board) dated August 31, 2022, which affirmed the decision and order of a workers' compensation judge (WCJ), circulated February 16, 2022 (WCJ's Decision). On appeal, Claimant argues it was error for the Board to affirm the WCJ's finding he was an independent contractor at the time of his injury and, therefore, not entitled to workers' compensation (WC) benefits. After review, we affirm the Board's order.

## BACKGROUND

Claimant, a commercial truck driver, began working as a delivery driver for Fundamental Labor Strategies, Inc. (FLS) in March 2019. Certified Record (C.R.), Item No. 13. On February 17, 2021, Claimant filed a claim petition alleging on February 6, 2020, he sustained a lumbar disc injury while unloading a window during the course and scope of his employment with FLS. *Id.* Claimant then filed a petition for penalties alleging FLS violated the Pennsylvania Workers' Compensation Act[1] by failing to timely file Bureau of Workers' Compensation documents accepting or rejecting liability for his work injury. *Id.* Claimant filed an additional claim petition alleging that also on February 6, 2020, he sustained adjustment disorder with anxious and depressed mood and chronic pain syndrome from his work injury. *Id.* After each of Claimant's filings, FLS filed an answer denying an employment relationship with Claimant.

In support of his two claim petitions, Claimant testified FLS was not a motor carrier, and explained FLS sent him to different driving assignments with various clients. *Id.* After finishing his previous assignment, FLS emailed Claimant his assignments for the next day, which included the required arrival time, the address, and the items he was to deliver. *Id.* Claimant first testified he was permitted to accept or reject assignments, but later testified he did not feel he could decline an assignment. *Id.* When carrying out an assignment, Claimant received routing instructions from the motor carrier, and he drove trucks owned by the clients. *Id.*

Regarding his employment relationship with FLS, Claimant understood FLS treated him as an independent contractor, and he had worked as an independent contractor for other companies. *Id.* Claimant testified FLS provided him a hat with

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

FLS's logo, but he was not required to wear it. *Id*. Claimant never drove a truck owned by FLS or displaying FLS's logo. *Id*. FLS paid Claimant by check and Claimant understood FLS made no tax deductions, and he was responsible for paying his own taxes. *Id*. Claimant admitted he signed an independent contractor occupational accident insurance enrollment form in March 2019, but claimed he did not understand FLS would take deductions from his pay for the insurance. *Id*.

In response, Curtis Ball (Ball), the president of FLS, testified FLS is a transportation broker with two brokerage services. *Id*. FLS offers a dedicated driver service, which private motor carriers use to haul their own goods, rather than hauling another's goods for a fee. *Id*. Ball testified FLS considers dedicated service drivers employees of FLS and closely manages them. *Id*. FLS dictates the assignments and hours of dedicated service drivers, and these drivers are required to report to work to perform their assignments. *Id*. The dedicated service drivers receive life insurance, disability insurance, and health benefits, and are subject to FLS's internal rules and regulations. *Id*. They also receive W2 tax forms. *Id*.

Ball explained the other service offered by FLS is the flex driver brokerage service. *Id*. This service matches motor carriers having a short term need for a driver with drivers who want to work. *Id*. These assignments can range from a day to a week or a month. *Id*. Ball indicated flex drivers determine how much they want to work. *Id*. The flex drivers transport themselves to the clients' locations and drive the clients' vehicles. *Id*. The client provides any trip sheet or routing information. *Id*. The motor carrier or shipper sets the start time for the job and the number of stops to be made during the assignment. *Id*. Flex drivers are paid a flat fee and receive a 1099 tax form. *Id*. Flex drivers are free to accept or reject assignments. *Id*. In order to provide flex drivers with as much information as possible to make

3

decisions about accepting assignments, FLS obtains as much information about the assignment from the client as possible including the work days available, the start times, the equipment that will be operated, the number of deliveries to be made, whether the equipment is temperature controlled, the type of transmission in the vehicle, and any other relevant information. *Id*. There are no repercussions if a flex driver rejects an assignment. *Id*. Additionally, flex drivers are permitted to drive for other companies. *Id*.

Regarding Claimant's work with FLS, Ball testified Claimant was a flex driver and received driving assignments from FLS in 2019 and 2020. *Id*. Claimant executed a W2 in July 2018 on which he indicated he was a sole proprietor or LLC. *Id*. Additionally, Ball testified Claimant executed an application for independent contractor occupational accident insurance. *Id*. In his testimony, Ball explained flex drivers provide FLS with proof they are insured so FLS knows the driver is covered in the event of a loss, but FLS does not provide coverage or require specific accident insurance coverage for flex drivers. C.R., Item No. 26. Ball testified that as a flex driver, Claimant was permitted to accept or reject assignments, and he had documentation Claimant rejected 11 assignment offers. C.R., Item No. 13. There were no repercussions for Claimant rejecting the assignments. *Id*.

Based on the testimony presented, the WCJ found Claimant did not establish an employment relationship with FLS and dismissed Claimant's claim petitions and petition for penalties. *Id*. The WCJ noted that to the extent "Claimant and [Ball's] testimony] differs, [Ball's] testimony is accepted as credible, particularly where he testified that there were at least 11 instances of refused assignments, but ongoing assignments offered to Claimant." *Id*. The WCJ found Ball's testimony regarding

4

the flex driver program crucial in establishing Claimant was an independent contractor rather than FLS's employee. *Id.*

Claimant appealed to the Board. Ultimately, the Board determined the WCJ did not err in finding Claimant was an independent contractor. C.R., Item No. 16. The Board rejected Claimant's challenges to the WCJ's weight and credibility determinations, which determinations are binding on appeal. *Id.* Noting the WCJ's findings were supported by substantial, competent evidence, the Board affirmed the WCJ's Decision. *Id.*

Claimant now petitions this Court for review of the Board's order. On appeal, Claimant argues the Board erred in concluding he was an independent contractor at the time of his injury. Claimant's Br. at 10. Specifically, Claimant contends he was not an independent contractor because FLS exercised control over his work. *Id.* at 18. In response, FLS contends the Board properly affirmed the WCJ's Decision as substantial evidence supported the WCJ's finding Claimant was an independent contractor. FLS's Br. at 6.

### DISCUSSION

Our review in WC appeals is limited to "determining whether the WCJ's findings of fact were supported by substantial evidence, whether an error of law was committed, or whether constitutional rights were violated." *Pierson v. Workers' Comp. Appeal Bd. (Consol Pa. Coal Co. LLC)*, 252 A.3d 1169, 1172 n.3 (Pa. Cmwlth.), *appeal denied*, 261 A.3d 378 (Pa. 2021). Relevant to this appeal, the question of whether an employee-employer relationship exists is a question of law subject to our plenary, *de novo* review. *Am. Rd. Lines v. Workers' Comp. Appeal Bd. (Royal)*, 39 A.3d 603, 610-11 n.6 (Pa. Cmwlth. 2012). However, where substantial evidence supports the WCJ's findings, we defer to those findings as the

5

WCJ is the ultimate fact finder in workers' compensation cases and "has exclusive province over questions of credibility and evidentiary weight." *Anderson v. Workers' Comp. Appeal Bd. (Penn Ctr. for Rehab.)*, 15 A.3d 944, 949 (Pa. Cmwlth. 2010). The WCJ is free to accept or reject the testimony of any witness, *Edward v. Workers' Compensation Appeal Board (Epicure Home Care, Inc.)*, 134 A.3d 1156, 1161 (Pa. Cmwlth. 2016), and this Court is bound by those credibility determinations. *A&J Builders, Inc. v. Workers' Comp. Appeal Bd. (Verdi)*, 78 A.3d 1233 (Pa. Cmwlth. 2013).

For a claimant to receive WC benefits, the claimant must prove an employer-employee relationship exists because "[a]n independent contractor is not entitled to benefits." *Universal Am-Can v. Workers' Comp. Appeal Bd. (Minteer)*, 762 A.2d 328, 330 (Pa. 2000). Whether an employer-employee relationship exists depends on the unique facts and circumstances of each case. *3D Trucking v. Workers' Comp. Appeal Bd. (Fine and Anthony Holdings Int'l)*, 921 A.2d 1281 (Pa. Cmwlth. 2007). In considering whether a claimant is an independent contractor versus an employee, we consider many factors, including:

> (1) control of manner the work is done; (2) responsibility for result only; (3) terms of agreement between the parties; (4) nature of the work/occupation; (5) skill required for performance; (6) whether one is engaged in a distinct occupation or business; (7) which party supplies the tools/equipment; (8) whether payment is by time or by the job; (9) whether work is part of the regular business of employer; and, (10) the right to terminate employment.

*Am. Rd. Lines*, 39 A.3d at 611 (internal citation omitted). While no factor is dispositive, control over the work and the manner it is performed are primary factors in determining employment status. *Universal Am-Can*, 762 A.2d at 333. Where an alleged employer has the right to select the employee, the right and power to

6

discharge the employee, the power to direct the manner of performance, and the power to control the employee, there is sufficient control to establish an employer-employee relationship. *3D Trucking*, 921 A.2d at 1288. Additionally, payment of wages and payroll deductions are a significant consideration, as is a tax filing noting self-employment. *Id. See also Guthrie v. Workers' Comp. Appeal Bd. (The Travelers' Club, Inc.)*, 854 A.2d 653, 662-63 (Pa. Cmwlth. 2004).

Because of the relationships among drivers, owner-operators and motor carriers and the thorough regulation of them, the trucking industry presents unique challenges in determining whether an employer-employee relationship exists. *Am. Rd. Lines*, 39 A.3d at 611. In these cases, in addition to the previously outlined factors, we also consider the degree of supervision and control over delivery routes and the timing of work or schedule. *Id.*

Here, the WCJ analyzed and weighed the testimony and each of the WCJ's findings are supported by evidence in the record. *See generally* C.R., Item No. 13. Accordingly, we conclude substantial evidence supports the WCJ's factual findings about Claimant's employment relationship with FLS. Because the Board is bound by the same standard of review we are, it did not err in reaching the same conclusion.

Turning to the WCJ's legal conclusion Claimant was an independent contractor, we note the WCJ rejected Claimant's testimony to the extent it conflicted with Ball's testimony. Ball testified Claimant had no guarantee of work and was free to refuse work or even work for another company. He also testified FLS paid Claimant by check and took no tax deductions, instead FLS provided Claimant a Form 1099 and he was responsible for paying his own taxes. As to the amount of control, FLS provided Claimant with assignments and information from the client about pick-up and drop-off locations. While requests about the manner of work may

7

have come from the clients, FLS did not dictate to Claimant which assignments to accept, how to complete the assignments, what routes to travel, and what times to drive each day or for how long. FLS did not provide a uniform or the vehicles for Claimant to drive, nor did FLS train Claimant. While none of these facts are individually dispositive, taken as a whole, these findings reflect Claimant controlled the time and manner of his work, primarily by his ability to accept or reject assignments.

In analyzing the WCJ's legal conclusion Claimant was an independent contractor at the time of his injury, the Board explained:

> Herein, the WCJ credited the testimony of Claimant and [Ball] that Claimant signed an independent contractor occupational accident insurance form so he would have his own insurance in the case of an accident since he was treated as an independent contractor with [FLS] similar to his prior independent contractor driving jobs. Additionally, the credible testimony of Claimant and [Ball] supports the Claimant did not drive [FLS's] truck, since [FLS] did not own any trucks, trailers, or warehouses, and the hat provided by [FLS] with the company logo on it was a gift which was not required to be worn by Claimant during driving assignments as a uniform. Moreover, the credible testimony establishes that [FLS] had no control over Claimant's daily routes, starting or ending times, etc., and that Claimant was entitled to, and in fact took advantage of, rejecting job assignments without repercussions. This credible evidence constitutes substantial evidence to support the WCJ's finding that Claimant was an independent contractor rather than an employee for [FLS] based on the terms of the agreement that Claimant would be an independent contractor for [FLS], that [FLS] did not supply Claimant's tools to perform his job, and [FLS] did not retain control [over] the manner of Claimant's driving on assignments. Consequently, the WCJ properly determined Claimant failed to meet his burden establishing an employment relationship with [FLS].

C.R., Item No.16. We agree with the Board's determination.

8

**CONCLUSION**

Because this Court may not reweigh the evidence or second-guess the WCJ's credibility determinations, and because substantial evidence in the record supports the WCJ's findings of fact and conclusions of law, we discern no error by the Board in affirming the WCJ's Decision Claimant was an independent contractor. As an independent contractor, Claimant was not entitled to WC benefits. Accordingly, we affirm the Board's Order.

_____
STACY WALLACE, Judge


Judge Fizzano Cannon did not participate in the decision of this case.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Wilfredo Ayala,                          :
                    Petitioner           :  No.  1037 C.D. 2022
                                         :
          v.                             :
                                         :
Fundamental Labor Strategies, Inc.       :
(Workers' Compensation Appeal            :
Board),                                  :
                    Respondent           :


# **O R D E R**


    **AND NOW**, this 2nd day of January 2024, the Order of the Workers' Compensation Appeal Board dated August 31, 2022, is **AFFIRMED**.


                                    _____

                                    STACY WALLACE, Judge